IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 14-50163

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GREGORY P. BOYD,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

December 9, 2014

Lyle W. Cayce
Clerk

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before JOLLY and COSTA, Circuit Judges, and ROSENTHAL, District Judge.*

ROSENTHAL, District Judge:

This is an appeal from a conviction and sentence for evading federal income taxes by filing false returns. Neither the legal nor factual issues are novel. Defendants prosecuted under 26 U.S.C. § 7206(1) cannot be convicted unless the government proves that they willfully violated the law. A recurring defense argument in such prosecutions is that the government has not proven willfulness because it failed to show the absence of a good-faith belief that the defendant did not have to file returns or pay taxes. The argument is often

_____

* District Judge of the Southern District of Texas, sitting by designation.

based on a theory about why federal income tax laws are invalid or unenforceable or why they do not apply to the defendant. Defendants often argue that even if the theory is so wrong that it is objectively unreasonable, they nonetheless believed it in good faith.

Gregory P. Boyd was convicted of three counts of filing false income tax returns showing he had no taxable income. Before and during trial, Boyd took the position that these tax returns reflected his belief that the only people required to pay federal income taxes were those who earned income working for the federal government. On appeal, Boyd asserts that the government failed to prove that he did not hold this belief in good faith. He challenges the denial of funding for neuropsychologist testimony, the admission of uncharged conduct, the prosecutor's statements, the judge's statements, the jury instructions, the response to a jury note, and the sufficiency of the evidence. We affirm.

## I.    BACKGROUND

Boyd filed his tax returns for 2004, 2005, and 2006 in October 2007. He had recently read a book called *Cracking the Code,* which espoused a theory that federal income tax obligations applied only to individuals who earned income working for the federal government. The three returns Boyd filed in October 2007 declared that in 2004, 2005, and 2006, he had zero income and zero tax liability. That was not true. During those three years, Boyd had continued the work he had done in prior years for a company called Pinnacle Partners, and had earned income totaling $795,000.

In April 2006, Boyd sent his income and expense information for 2004 to the tax specialist he had previously used. This specialist prepared a return for Boyd to file showing a tax liability of over $27,000. Boyd did not file the return he received from the tax specialist. Instead, in October 2007, he filed a return for 2004 filled with zeroes: zero income, zero credits and deductions, and zero

tax liability. One day later, Boyd filed similar returns for tax years 2005 and 2006.

The IRS sent Boyd a letter warning that the returns were "frivolous" and had "no basis in law," and that the United States Supreme Court had rejected similar arguments for avoiding taxes. ROA 702. Boyd responded with a letter rejecting this "attempt at witness-tampering and/or extortion." ROA 706. The IRS scheduled a meeting with Boyd to audit his tax returns, but Boyd did not appear.

In March 2013, a grand jury indicted Boyd on three counts of violating 26 U.S.C. § 7206(1). Boyd retained a lawyer in May 2013. Four months later, Boyd lost his job. The trial judge denied Boyd's motion to have counsel appointed because Boyd was not indigent and he had retained counsel who had not been discharged. Boyd's retained counsel continued to represent him, assisted by another lawyer who Boyd asserts was working pro bono.

The issue at trial was whether Boyd believed in good faith that he had no taxable income. Before trial, defense counsel filed motions asking the judge for funds under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, for a neuropsychologist to examine Boyd and testify about whether he had a mental impairment from playing professional football years earlier, and whether this contributed to his belief that what he had read in *Cracking the Code* was true. Boyd's lawyer supported these motions by explaining that in her 2013 interactions with him, she saw signs of poor memory and confusion. The district court denied the motions, finding that Boyd was not indigent, as evidenced by the fact that he had retained private counsel, and that the proposed testimony was irrelevant and unnecessary for Boyd's defense.

During opening statements, defense counsel referred to Boyd as "Greg." ROA 553. The district judge interrupted to remind her that in the formality of

federal court, lawyers should refer to their clients by their last names and not by such familiar terms as "Greg," "Butch," or "Shorty." ROA 553.

At trial, the prosecution introduced Boyd's filed tax returns for 2003 and 2007 to 2011 and his tax transcripts for 1990 to 2011. The documents showed that Boyd had filed accurate and timely returns for tax years 1994 to 2001, during which he was subject to withholding and received a refund. In 2002 and 2003, Boyd did not have taxes withheld and delayed filing his returns. The government presented evidence showing that Boyd's taxable income from 2004, 2005, and 2006 totaled $795,000 and that his expenses met or exceeded his income each year. Pinnacle Partners, the company Boyd worked for, had sent him 1099 forms showing his earned income for each of the tax years at issue.

The returns for tax years 2007 to 2011 showed that Boyd continued to file inaccurate returns declaring zero income even after receiving warnings from the IRS. Boyd objected to the admission of both the pre-2004 and post-2006 returns and related documents.

Boyd elected to take the stand. He testified that based on *Cracking the Code*, he believed that only people who received income from the federal government had to pay taxes. Peter Hendrickson, the author of *Cracking the Code*, also testified for the defense. He explained that, contrary to Boyd's position, his book did not express the view that individuals had no obligation to accurately declare their income and pay federal taxes. When the prosecutor questioned Boyd about that statement on cross-examination, Boyd responded that he had not heard that part of Hendrickson's testimony.

The parties agreed that despite Hendrickson's testimony, his book did present the theory that Boyd described. The prosecutor told the judge that he should not have cross-examined Boyd about that part of Hendrickson's testimony because it could confuse the jury. The district court proposed that the

parties stipulate that Hendrickson's testimony was wrong on that point, but Boyd did not agree. The prosecutor then proposed that he would clarify in closing argument that Hendrickson's book espoused the theory described. The court agreed, and counsel for Boyd did not object.

In closing argument, the prosecutor told the jury that *Cracking the Code* did state that only those who earned income from the federal government had to pay federal income taxes. The prosecutor then told the jury that "even though it's in the book, it is wrong. It's absurd. It's one of the most preposterous things I've ever heard in my life. And I will argue to you that even if Mr. Boyd read it, he didn't believe it." ROA 1054–55.

In her closing argument, defense counsel reiterated that Boyd had acted in good faith. She used phrases such as "no freaking way," "same-old crap," and "screw up." ROA 1075–76, 1084. Later, outside the jury's presence, the judge reprimanded her for using inappropriate language in her argument.

During the jury's deliberations, the court responded to four notes. The third note asked whether the jury could stay past the usual ending time of 6:00 p.m. to continue deliberating. The court responded to this note without consulting the lawyers on the record, telling the jury that if they did not finish by 6:00 p.m., they would return the next day. Before 6:00 p.m., the jury returned a guilty verdict on all three counts.

Before sentencing, Boyd's counsel again moved for the appointment of a neuropsychologist to offer evidence in support of a downward adjustment for mental impairment under § 5K2.13 of the Sentencing Guidelines. The court denied the motion. The court sentenced Boyd to 33 months on each count, to be served concurrently, the lowest end of the 33 to 41 month Guidelines range.

Boyd timely appealed.

No. 14-50163

## II.  DISCUSSION

### A.  The Request for CJA Funds for a Neuropsychologist

Defense counsel asked the district court six times to declare Boyd indigent and appoint a neuropsychologist to evaluate him and testify about whether he had a mental impairment that contributed to a good-faith belief that the returns he filed were truthful and lawful.  The district court denied each motion, finding that Boyd was not indigent and that the proposed expert testimony was not necessary for his defense.  Boyd argues that the inability to present neuropsychological testimony prejudiced his ability to defend and  to argue for a reduced sentence.  We review these rulings for abuse of discretion. *See United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006).

Even if Boyd was indigent, to obtain CJA funds, he needed to show that the testimony he sought to introduce was necessary.  The CJA, 18 U.S.C. § 3006A(e), provides that a "person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation" may obtain such services after demonstrating in an *ex parte* proceeding that the services are necessary.  The burden is on the defendant "[t]o justify the authorization of investigative services under § 3006A(e)(1), . . . demonstrat[ing] with specificity[ ] the reasons why such services are required." *United States v. Gadison*, 8 F.3d 186, 191 (5th Cir. 1993) (emphasis omitted).  Boyd intended to use the neuropsychologist's testimony to show that he lacked the *mens rea* necessary for the charged offenses.

Under the Insanity Defense Reform Act (IDRA), 18 U.S.C. § 17, insanity is an affirmative defense to be proved by clear and convincing evidence, but "[m]ental disease or defect does not otherwise constitute a defense."  The IDRA does not address whether expert testimony on a mental defect may be admitted to negate the specific intent element of a charged offense.  Some circuits have found such evidence admissible, but only under limited circumstances because

6

of the risks it presents. *See United States v. Eff*, 524 F.3d 712, 720 n. 11 (5th Cir. 2008) (noting the practice in other circuits). The Eleventh Circuit has noted that psychiatric evidence rarely negates specific intent, presents an inherent danger of distracting the jury from the presence or absence of *mens rea*, and "may easily slide into wider usage that opens up the jury to theories of defense more akin to justification." *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (quoting *United States v. Pohlot*, 827 F.2d 889, 904–05 (3d Cir. 1987). District courts therefore "must examine such . . . evidence carefully to ascertain whether it would, if believed, 'support a legally acceptable theory of lack of *mens rea*.'" *Id.* (quoting *Pohlot*, 827 F.2d at 906).

The Fifth Circuit has not ruled on the issue, and we need not do so here. Even under the cases allowing similar evidence, the district court did not abuse its discretion by excluding it in this case. Boyd based his argument for the evidence on the fact that he had played professional football decades earlier and on what his lawyer observed in 2013. But the issue was Boyd's *mens rea* in 2007. In the years before and after 2007, Boyd was an independent consultant at Pinnacle Partners working to obtain regulatory approvals for large real-estate development projects. There was no evidence that any mental-health professional, physician, family member, or colleague had raised concerns about Boyd's cognitive abilities or suggested that any cognitive defects impaired his ability to perform his job in those years. We find no abuse of discretion in denying the requests for the appointment and funding of a neuropsychologist to examine Boyd.

## B.    Evidence of Other Tax Filings

Boyd challenges the district court's admission of his tax transcripts from 1990 to 2011 and his tax returns from 2003 and 2007 to 2011. A district court's evidentiary rulings are reviewed under an abuse-of-discretion standard. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011). Even if the district

court erred in admitting the evidence, we look to see whether harm resulted. *Id.*

The documents at issue were relevant to whether Boyd willfully violated the law, that is, whether Boyd believed, in good faith, that only those working for the federal government were subject to federal income taxes. Evidence of willfulness includes a defendant's history of previously filing accurate tax returns and his receipt of warning notices from the IRS. *United States v. Shivers*, 788 F.2d 1046, 1048–49 (5th Cir. 1986).

The tax transcripts and tax return from the years before 2007 showed that when Boyd's taxes were withheld, as in tax years 1994 to 2001, he complied with his tax obligations. When his taxes were not withheld, as in tax years 2002 and 2003, he delayed filing his returns. This evidence was relevant both to Boyd's knowledge and understanding of his tax obligations, as well as to his financial condition when he was not subject to withholding and his motivation to at least delay filing his returns and paying his taxes.

The transcripts and returns from the years after 2007 reflected that Boyd continued to file returns filled with zeroes, even after the IRS warned him that his filings were based on frivolous legal positions. These documents were admitted to show that even after Boyd was informed of his tax obligations and of the absence of any basis to avoid them, he continued to file false tax returns. On one level, the returns showed that Boyd was consistent in his professed good-faith belief that filing returns showing no income was lawful. On another level, the returns evidenced Boyd's intent to violate the law by showing that he continued to file no-income returns after learning that there was no basis to do so. The district court did not abuse its discretion in admitting these documents.

## C.    Sufficiency of the Evidence

Boyd argues that the district court erred in denying his Rule 29 motion for acquittal because the evidence was insufficient to support his conviction. We review the denial of his motion for acquittal *de novo*, asking whether, viewing the evidence in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense charged beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Miller*, 588 F.3d 897, 907 (5th Cir. 2009).

Proving a § 7206(1) violation requires the government to prove that the defendant: (1) made and signed a materially false federal income tax return; (2) submitted a written declaration stating under penalties of perjury that the return was true and correct; (3) did not believe that the return was true and correct when he signed it; and (4) signed it willfully and with the specific intent to violate the law. *United States v. Bishop*, 264 F.3d 535, 552 (5th Cir. 2001). "Willfulness . . . requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991).

The evidence showed that Boyd had declared his income and paid taxes for 14 years before filing the returns charged in the indictment. Before Boyd read *Cracking the Code*, he had hired an accountant to prepare his 2004 tax return and, in April 2006, paid the account for that work. Instead of filing the return the accountant prepared and sent him, Boyd delayed until October 2007, when he completed and filed his own returns for 2004, 2005, and 2006 showing zero income and zero taxes due. Boyd had received a 1099 form reporting his taxable income for each of the three years. There was ample evidence that Boyd knew he had a duty to report his income accurately and pay taxes, as he had done for 14 years and as his tax-return preparer had done for

9

him for tax year 2004; that he had no good-faith belief that he was suddenly no longer subject to federal income tax laws; and that he willfully violated the law by filing returns showing no income and no tax liability. *See Cheek*, 498 U.S. at 201; *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005). The district court did not err in denying the motion for acquittal.

**D.    Jury Instructions**

Boyd did not object to the jury instructions at trial. He now argues that they did not sufficiently explain that the jury had to find that he willfully signed a false tax return to convict him. We review this claim for plain error. *See United States v. Martin*, 332 F.3d 827, 834 (5th Cir. 2003).

"Plain error exists if (1) there was error; (2) the error was clear and obvious; and (3) the error affected a substantial right." *United States v. Burns*, 526 F.3d 852, 858 (5th Cir. 2008). An error is clear and obvious if its existence cannot be reasonably debated. *See United States v. Bohuchot*, 625 F.3d 892, 897 (5th Cir. 2010). Generally, an error affects a defendant's substantial rights "if there is a reasonable probability that the result of the proceedings would have been different but for the error." *United States v. Montes-Salas*, 669 F.3d 240, 247 (5th Cir. 2012). Even when those conditions are satisfied, we have discretion to correct the forfeited error only if it seriously affects the fairness, integrity, or public reputation of court proceedings. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

The district court instructed the jury that to convict, it had to find "[t]hat the defendant made the statement willfully, that is, with intent to violate a known legal duty." ROA 402. The instructions defined "willfully" as acting "intentionally — not by accident or mistake — with knowledge his conduct violated the law." ROA 403. This instruction was consistent with the Supreme

No. 14-50163

Court's definition of willfulness in the context of a tax-law violation as "a voluntary, intentional violation of a known legal duty." *Cheek*, 498 U.S. at 200 (citing *United States v. Pomponio*, 429 U.S. 10, 12 (1976)). We find no error.

## E.     Prosecutorial and Judicial Misconduct

Boyd claims that both the prosecutor and the judge made prejudicial comments that deprived him of a fair trial. Because Boyd did not contemporaneously object, we again review for plain error. *See United States v. Mares*, 402 F.3d 511, 515 (5th Cir. 2005).

During closing, the prosecutor argued that Boyd did not believe in good faith that the theory he read in *Cracking the Code* was legally sound. The prosecutor stated that the theory was "wrong," "absurd," "one of the most preposterous things I've ever heard in my life," and "one of the dumbest things I have ever heard." ROA 1055–62.

While there is "wide latitude" in making closing arguments, *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007) (quotation marks and citation omitted), they are limited to "properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence," *United States v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010) (quotation marks and citation omitted). A prosecutor "may not express his personal opinion on the merits of the case or the credibility of witnesses," including the defendant. *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013) (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)).

A reviewing court considers a prosecutor's closing argument as a whole and in the context of the trial. *Thompson*, 482 F.3d at 785. Recognizing that closing argument is just that — argument — we allow prosecutors to use expressive language and "a bit of oratory and hyperbole" in arguments, *id.* at 786, and we generally place statements characterizing a defendant's positions or

arguments as "ridiculous, absurd, and insulting" in this category. *United States v. Bush*, 451 F. App'x 445, 451 (5th Cir. 2011) (unpublished).

Because the prosecutor also offered his personal opinion that the theory Boyd claimed to believe was "one of the most preposterous things I've ever heard in my life," and "one of the dumbest things I have ever heard," we consider whether these statements affected Boyd's substantial rights. To do so, we consider three factors: (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the inculpatory evidence supporting the conviction. *United States v. Aguilar*, 645 F.3d 319, 325 (5th Cir. 2011).

The contested statements were at most weakly prejudicial. The unreasonableness of Boyd's theory was supported by the theory itself, as well as by the witness testimony and Boyd's prior recognition of his duty to pay taxes. Viewing the isolated statements in the context of the overall argument, it is clear that the prosecutor argued only that Boyd, an educated professional, did not subjectively believe, in good faith, the objectively unreasonable theories espoused in *Cracking the Code*. And viewed in the context of the strong evidence of guilt presented in the trial, these brief statements in closing argument did not affect Boyd's substantial rights. *See United States v. Delgado*, 672 F.3d 320, 337 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 525 (2012).

Nor do we find plain error in the district court's statements, made outside the jury's presence, that Boyd's tax theory was "the most absurd theory of all the theories I've tried in 20 years," and "just malarkey." ROA 470, 472. The jury did not hear these comments, and they provide no basis for reversal.

Boyd also challenges two of the district judge's statements made in front of the jury. During Boyd's testimony, counsel asked him to "explain to the jury why you think you're here today." ROA 963. When the prosecutor objected, the court interjected, "[b]ecause he's indicted and arrested and brought here

under the law." *Id.* During opening argument, the district court reminded defense counsel to refer to her client by his last name, not as "Greg," "Shorty," or "Butch." ROA 553.

The judge's first comment was an accurate statement of the reason for Boyd's presence, made in response to an irrelevant question by Boyd's counsel that drew an objection. The second comment reiterated the judge's instructions to all counsel to maintain an appropriate level of formality, instructions that defense counsel found difficult to follow. The jury instructions included a reminder to the jury that "[n]o matter what I do or say up here, don't think I have any opinion one way or the other on this case. That is your job." ROA 537. These comments present no reversible error. *See United States v. Munoz-Romo*, 947 F.2d 170, 180 (5th Cir. 1991), *rev'd on other grounds*, 506 U.S. 802 (1992); *United States v. Davis*, 752 F.2d 963, 975 (5th Cir. 1985).

## F.    Jury Note 3

The district court told the jury when they started deliberating that they would work from 8:30 a.m. to 6:00 p.m. At the end of the third day of deliberations, the jury sent a note at around "5pm" indicating that they were "still working" but that "[i]f we could stay past 6 I think we would get there. Otherwise we should come back in the morning." ROA 1221. The district court did not address the note on the record. At "4:58 p.m.," the court responded with a note telling the jury to "[t]ry to get a verdict by 6pm — if not you will need to return tomorrow morning." ROA 1221. The jury was able to reach a verdict before 6:00 p.m.

Boyd claims that the district court erred by not reading the note into the record and holding an on-the-record conference to discuss the response with counsel. We ordinarily review challenges to a district court's responses to jury notes for abuse of discretion. *See United States v. Daniels*, 281 F.3d 168, 183–

84 (5th Cir. 2002). Because Boyd did not object to how the district court handled the response, including in his motion for acquittal, our review is for plain error. *See id.*

A defendant generally has the right to receive notice when the court receives a jury note and to be given an opportunity to be heard on the response. *See United States v. Bieganowski*, 313 F.3d 264, 293 (5th Cir. 2002). If a court responds to a question on a ministerial matter such as scheduling without consulting counsel, however, there is generally no harm to the defendant's substantial rights. *See United States v. Ceja*, 387 F. App'x 441, 443 (5th Cir. 2010) (unpublished) (denying the appellant's request to supplement the record on appeal with jury notes about requests for lunch and a smoke break because, even if the defendant was not consulted, the notes were "immaterial"). In this case, the district court's response told the jury that the previously announced schedule continued to apply. We find no abuse of discretion, much less plain error.

## G.     Sentencing

Boyd appeals his within-Guidelines 33-month sentence as procedurally and substantively unreasonable. Boyd did not contemporaneously object, and our review is again for plain error. *See United States v. Mondragon-Santiago*, 564 F.3d 357, 361 (5th Cir. 2009); *United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007), *cert. denied*, 554 U.S. 921 (2008).

Boyd argues that his sentence was unwarrantedly disparate from the sentences of other defendants based on a survey he compiled and presented to the district court of sentences in what he asserts were similar tax cases across the country. The court, of course, had little information about the defendants in Boyd's survey, who were generally sentenced to serve between 6 and 24 months. The district court's within-Guidelines 33-month sentence was presumptively reasonable and was sufficiently explained. We find neither abuse

of discretion nor plain error in the district court's decision not to sentence in the range Boyd's survey suggested.

## H.     Ineffective Assistance of Counsel

Finally, Boyd argues that his chosen trial counsel was constitutionally ineffective.  Claims of constitutionally ineffective counsel generally should not be raised on direct appeal unless they were presented to the trial court.  *See United States v. Aguilar*, 503 F.3d 431, 436 (5th Cir. 2007).  We see no reason for a different approach here.

AFFIRMED.