**REVISED DECEMBER 16, 2015**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 14-40046

———————

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>    Plaintiff - Appellee

v.

MELVIN ANTONIO BENITEZ, also known as Loco, also known as Raul
Molina, also known as Carlos Martinez; URIEL RAYO NAVARRO, also
known as Balter Noriega,

>    Defendants - Appellants

————————————————

Cons /w 14-40921

UNITED STATES OF AMERICA,

>    Plaintiff - Appellee

v.

SANTOS FLORES CASAS, also known as Angel,

>    Defendant - Appellant

————————————

Appeals from the United States District Court
for the Eastern District of Texas

————————————

Before JOLLY, HAYNES, and COSTA, Circuit Judges.

No. 14-40046

E. GRADY JOLLY, Circuit Judge:

Three defendants appeal their convictions for conspiracy to manufacture and distribute controlled substances and related charges. These defendants were part of a group of thirty-seven people who were indicted for a drug conspiracy after a multi-year FBI investigation that recorded over 77,000 telephone calls. Other than the three defendants here (and codefendants who do not appeal), all indicted coconspirators pled guilty, and many testified against these defendants. Defendants challenge an evidentiary ruling concerning a voice identification expert, the sufficiency of the evidence against them, and the propriety of their sentences. For the reasons that follow, we affirm the convictions and affirm all of the sentences other than Casas'. With respect to Casas' sentence, we hold that the district court incorrectly applied a mandatory minimum sentence and remand for resentencing.

I.

The FBI investigation began when a single confidential informant purchased drugs from the defendant Benitez; over a period of months, the investigation grew to include multiple confidential informants, wiretaps, pen registers, and police surveillance. Many of the recorded conversations took place in Spanish; FBI linguist Maria Haynes-Spanier listened to every call and reviewed every transcript. In combination with testimony from cooperating witnesses, this evidence showed a pattern of drug activity loosely organized into a decentralized conspiracy. After listening to all the calls admitted into evidence, Special Agent Michael Hillmant calculated that 9.7 kilograms of cocaine changed hands and that 21.89 kilograms were discussed. The relevant portion of the conspiracy was largely led by the Valdezes (a brother and sister who pled guilty). The following facts are relevant to these three defendants.

No. 14-40046

*1. Navarro*

Victor Manuel Castaneda testified that he frequently delivered distribution quantities of cocaine from Ms. Valdez to Navarro. Navarro was also recorded discussing drug sales with Ms. Valdez, including a discussion of buying cocaine on credit for resale. Navarro also directed the activities of lower-level drug distributers. Both Castaneda and Agent Haynes-Spanier testified that they recognized Navarro's voice on these phone calls.

Officers executed a legal search of a house titled in the name of Navarro's mother. Despite its location in a low-crime area, the house was heavily secured. The house contained a gun, ammunition, $6,000 in cash, and a forged identification card with Navarro's picture and the name Balter Noriega. At least initially, the house also contained Navarro himself—until he ran out the back door. He was quickly apprehended and initially identified himself as "Balter Noriega," but this ruse was soon discovered.

At the house, officers found a set of keys to Apartment 2078. Navarro admitted that he owned the apartment, showed officers how to get there, and consented to a search of the unit. When the officers arrived, a lower-level drug distributor to whom Navarro delivered drugs was present. Also present were 1.97 grams of cocaine and 22.7 grams of crack (spread among four hiding places and two cars) as well as paraphernalia related to the manufacture of drugs. The police also recovered a cell phone that matched a number Navarro had provided as his and a water bill addressed to "Balter Noriega."

*2. Casas*

As with Navarro, Castaneda testified that he delivered cocaine from Ms. Valdez to Casas. He testified that he delivered between half an ounce and an ounce every other day. At times, Casas would direct him to deliver the cocaine to an associate who lived in the same apartment complex. Multiple other

3

No. 14-40046

coconspirators testified that they regularly purchased cocaine from Casas. Casas was also recorded on several calls setting up drug transactions.

*3. Benitez*

Benitez was recorded selling drugs, guns or both on numerous occasions to two different confidential informants. Altogether, Benitez sold over 630 grams of cocaine and 6 ounces of heroin along with multiple firearms (both handguns and rifles) to confidential informants. One confidential informant testified that Benitez used "teenagers" to distribute drugs.

Two drug transactions are particularly relevant. In the first transaction, Benitez sold two ounces of cocaine and a .40 caliber handgun to a confidential informant. In the second transaction, which did not involve a confidential informant, Benitez was taped discussing the transaction over the phone. In one call, Benitez agreed to deliver a half ounce of cocaine and then addressed a child. Benitez told the child that they were "gonna go make some money"; the child replied, "I don't want to go"; and Benitez responded, "Yeah. Get in the car. I don't give a[n] [expletive]." In an unrelated call, the child gave her age as eight. In another recorded call, Benitez complained that he had more "wholesale" customers than "retail" customers, which limited his profits.

All three defendants went to trial. Navarro requested that the court appoint an expert in voice identification; this request was denied. All three defendants were convicted of conspiring to manufacture or distribute controlled substances in violation of 21 U.S.C. § 846. Benitez was also convicted of knowingly carrying a firearm during or in relation to a drug crime in violation of 18 U.S.C. § 924(c)(1). In a special interrogatory, the jury found that the conspiracy involved five or more kilograms of cocaine.

At sentencing, the court imposed multiple enhancements. Relevant to this appeal, it enhanced Navarro's sentence by three levels because he was a "manager or supervisor" and by two levels because he maintained a premises

4

No. 14-40046

for the purpose of manufacturing or distributing a controlled substance. U.S.S.G. § 3B1.1; § 2D1.1(b)(12).   The court enhanced Benitez's sentence by four levels because he was an "organizer or leader" of the conspiracy, U.S.S.G. § 3B1.1, and by two levels for involving minors in a drug crime.   U.S.S.G. §2D1.1(b)(14)(B) (2013).   Considering these enhancements, Benitez and Navarro were sentenced to within-guidelines sentences.   Casas was subject to a mandatory life sentence because he was convicted of a crime involving five or more kilograms of cocaine after having previously been convicted of two or more previous drug felonies.   21 U.S.C § 841(b).

## II.

We first address the argument that the court erred in refusing expert evidence.  After concluding that it did not, we face the question of whether that evidence was sufficient to convict the defendants; we hold that it was.  Finally, we address the defendant's challenges to their sentences.

Navarro requested that the court appoint an expert in voice identification to assist in his defense.   Navarro had the burden of "demonstrat[ing] with specificity[] the reasons why such services are required." *United States v. Boyd*, 773 F.3d 637, 642 (5th Cir. 2014).   The district court denied this request.  Where, as here, the defendant raised the issue below, the court reviews these denials for abuse of discretion.  *Id.*

Navarro argued that a voice-identification expert was necessary to rebut the testimony of the government's expert witness, Haynes-Spanier.  Haynes-Spanier, however, did not testify about voice identification in an expert capacity (her expertise was limited to translating Spanish).  The Federal Rules of Evidence explicitly authorize lay testimony about voice identification by anyone who had "hear[d] the voice at any time under circumstances that connect it with the alleged speaker."  Fed. R. Evid. 901(b)(5).  Thus, Navarro did not require expert testimony to rebut Haynes-Spanier's lay testimony and

was not precluded from offering lay testimony. The district court did not abuse its discretion by denying the motion to appoint an expert witness.

Each defendant challenges the sufficiency of the evidence for his conspiracy conviction. When challenges to the sufficiency of the evidence are preserved, they are reviewed de novo. *United States v. Hale*, 685 F.3d 522, 543 (5th Cir. 2012). When unpreserved, they are reviewed for plain error. *United States v. Delgado*, 672 F.3d 320, 328-32 (5th Cir. 2012) (en banc).

Under either standard of review, we find no merit in these challenges. To prove a drug conspiracy, the government must show: "(1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy." *United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008). All three defendants were recorded discussing drug transactions on the phone; these calls satisfied all four elements, showing an intent to purchase distribution quantities of drugs and the practice of distributing those drugs. Their voices were matched to the recording by Ms. Haynes-Spanier. This evidence alone would support a jury verdict; in each case, however, the recordings were corroborated by physical evidence, eyewitness testimony, or cooperating witnesses.

Benitez raises two additional challenges to the sufficiency of the evidence; both lack merit. First, he argues that the evidence was insufficient to establish that he personally distributed over five kilograms of cocaine. This argument misunderstands the law. "[T]he Government's burden was to prove the existence of a conspiracy, [the defendant's] involvement in it, and the requisite drug quantity . . . involved in the conspiracy beyond a reasonable doubt." *United States v. Turner*, 319 F.3d 716, 722–23 (5th Cir. 2003) (emphasis added).

No. 14-40046

Benitez also argues that his simultaneous sale of a handgun and drugs does not support a conviction for "carr[ying] a firearm" "during and in relation to any . . . drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). The Supreme Court has held that "[t]he fact that a gun is treated momentarily as an item of commerce does not render it inert or deprive it of destructive capacity. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon." *Smith v. United States*, 508 U.S. 223, 240 (1993) (holding that the exchange of a gun for drugs satisfies the "in relation" prong). As the Eleventh Circuit recently persuasively held:

> If indeed the purpose of the statute is to combat the dangerous combination of drugs and guns, as *Muscarello* [*v. United States*, 524 U.S. 125, 139 (1998)] held, and [the defendant] combined the drugs and gun in a . . . single transaction, as the jury found, it would flout the purpose of the statute to hold anything but that the gun was carried "during and in relation" to the drug offense.

*United States v. Timmons*, 283 F.3d 1246, 1251–52 (11th Cir. 2002). We agree with the Eleventh Circuit and hold that the simultaneous sale of a gun and drugs qualifies as carrying a gun in relation to a drug crime.

Finally, we turn to the defendants' challenges to their sentences. When challenges to a district court's interpretation or applications of sentencing guidelines are preserved, they are reviewed de novo; when unpreserved, they are reviewed for plain error. *United States v. Huerta*, 182 F.3d 361, 364 (5th Cir. 1999). Plain error is reviewed under a four-prong approach:

> First, there must be an error or defect. . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings." Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Meeting all four prongs is difficult, "as it should be."

7

*Delgado*, 672 F.3d at 329.  Similarly, factual findings supporting sentencing determinations are reviewed for clear error.  *United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002).  The different defendants challenge their sentences on several grounds.

Benitez argues that his sentence should not have been enhanced for involving minors in a drug crime.  U.S.S.G. § 2D1.1(b)(14)(B).  Because he did not raise this issue before the district court, it is subject to plain error review.  One witness testified that Benitez used "teenagers" to distribute drugs.  Further, Benitez was recorded telling an eight-year-old girl to get in the car to go to a drug deal.  It is plausible that Benitez brought the girl with him "to avoid detection of or apprehension [for] the particular crime."  *United States v. Alarcon*, 261 F.3d 416, 423 (5th Cir. 2001).  Given this evidence, the trial court did not plainly err by applying the enhancement.

Benitez also argues that he should not have received a four-level enhancement for being an organizer or leader of the conspiracy.  U.S.S.G. § 3B1.1.  The district court heard specific testimony that Benitez directed numerous others in carrying out the conspiracy.  Indeed, Benitez admits that he supervised others but asserts that "there was not enough evidence to support an enhancement higher than a manager or supervisor role under U.S.S.G. § 3B1.1(b) or (c)."  Benitez Br. at 15.  This unsupported assertion is not enough to show that the district court's factual finding of his role as a leader was clearly erroneous.

Similarly, Navarro challenges his two-level enhancement for being a manager or supervisor.  U.S.S.G. § 3B1.1(b).  The district court heard evidence that Navarro directed an associate to distribute drugs and allowed that associate to live in Navarro's apartment in exchange for delivering drugs as Navarro directed.  The district court did not clearly err in its factual determination that Navarro was a supervisor.

Navarro also argues that he should not have received a two-level enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). Because he did not raise this argument at sentencing, it is reviewed for plain error. *Huerta*, 182 F.3d at 364.

Navarro first argues that, under the commentary to § 2D1.1, the district court should have looked at two "factors" to determine whether Navarro "maintained" the apartment: "(A) whether the defendant held a possessory interest in (*e.g.*, owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." Although Navarro admits that he rented the apartment, he asserts that no evidence shows he controlled access to or activities at the apartment. We find this argument unavailing. Navarro kept a key to the apartment, described it as his to the officers, and received water bills there addressed to him (under an alias); Cervantes used the apartment rent-free on the condition that he "would help [Navarro] with his drug distribution." The district judge did not clearly err in finding that Navarro controlled activities at the apartment.

Navarro also cites the sentencing guidelines commentary in support of a second argument:

> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises.

U.S.S.G. § 2D1.1. Navarro argues that the evidence does not show that his "primary purpose" for the premises was drug manufacture. The presentencing report indicated, however, that Navarro did intend for the apartment to be used primarily to sell drugs. Thus, Navarro bears the burden to rebut that evidence by showing that it was "materially untrue, inaccurate or unreliable."

*United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998).  Navarro received drug deliveries at the apartment, and the search of the apartment revealed an air-breathing mask, a cutting agent, and a metal strainer (in addition to the drugs themselves).  Based on this evidence, the conclusion that Navarro used the apartment "primarily" to distribute drugs was not clearly erroneous.

Finally, all three defendants challenge their sentences in the light of this court's recent opinion in *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015).  In *Haines*, we held that "for purposes of statutory minimums at sentencing[] the relevant quantity is the quantity attributable to the individual defendant," and this individual quantity must be found by the jury.  *Id.* at 742.  Because *Haines* was decided after these defendants were sentenced, the judge determined the drug quantities attributable to each defendant, rather than submitting that question to the jury.  This mistake satisfies the first two prongs of the plain error analysis, even though *Haines* was decided after the sentencing.  *Henderson v. United States*, 133 S. Ct. 1121 (2013).

The third prong—whether the error affected the defendants' substantial rights—is not satisfied for Navarro and Benitez.  Both were sentenced to terms of imprisonment well above the mandatory minimum; no evidence suggests that the court considered the mandatory minimum in determining their sentences.  Thus, their rights were unaffected.

Casas, however, presents a different case.  The district judge calculated that Casas' guideline range was 292–365 months.  The court did not indicate that it viewed that range as inappropriate or that it planned to exercise its discretion to sentence Casas outside that range.  The other defendants were sentenced around the middle of their guideline ranges.  The court, however, erroneously viewed the statutory minimum sentence to be life, and sentenced Casas accordingly.  Thus, the mistaken belief about the mandatory minimum likely "affected the outcome of the district court proceedings" and thereby

No. 14-40046

affected Casas' substantial rights.  *Delgado*, 672 F.3d at 329.  Thus, the third prong of plain error analysis is satisfied.

Finally, this error significantly increases Casas' term of imprisonment—all the way to life imprisonment.  This error made the sentence mandatory and removed all discretion the district court would have had to consider any mitigating and equitable factors that could have significantly and substantially reduced a severe sentence.  For these reasons, the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," satisfying the fourth prong of plain error analysis.  *Id.*  We therefore exercise our discretion to vacate Casas' sentence and remand for resentencing.

VACATED and REMANDED
in part; AFFIRMED in part.

11